UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
LEWIS A. HAHN,                                              :
                                                            :
                            Plaintiff,                      :
                                                            :    08 Civ. 4261 (GEL)
        -v.-                                                :
                                                            :    **OPINION AND ORDER**
MICHAEL J. ASTRUE, COMMISSIONER OF                          :
SOCIAL SECURITY,                                            :
                                                            :
                            Defendant.                      :
                                                            :
------------------------------------------------------------x

Barry I. Weiss, Freedman, Wagner, Tabakman &
Weiss, New City, New York, for plaintiff.

Susan C. Branagan, Assistant United States Attorney,
New York, New York, for defendant.

GERARD E. LYNCH, District Judge:

   Plaintiff Lewis A. Hahn brings this action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security ("the Commissioner") denying him disability insurance benefits under Title II of the Social Security Act. The Commissioner now moves for judgment on the pleadings. For the reasons that follow, the motion will be granted.

## BACKGROUND

   Hahn, a sixty-six-year-old resident of Palisades, New York, has a college degree and a thirty-two year work history as an audio engineer. (R. 250, 441-43; see also R. 463-64.) He was last insured for disability insurance benefits on December 31, 2006.[1] (R. 21.)

---

[1] The Social Security Administration initially found Hahn's date last insured to be December 30, 2005. (R. 31.) However, the ALJ later concluded that the correct date last insured was December 31, 2006 (R. 21), and Hahn does not challenge that determination.

I.   **Medical Evidence**

    A.   Hearing Loss

On December 17, 2004, Dr. Daniel Grinberg, an otolaryngologist, examined Hahn following his complaints of hearing loss and tinnitus,[2] which Hahn asserted had developed steadily over the course of fifteen years. (R. 323-28.) After this examination, Dr. Grinberg concluded that when engaged in conversational speech, Hahn rarely or never misunderstood words. (R. 323, 325.) He also concluded that Hahn's ability to communicate was normal. (R. 326.) Consistent with these conclusions, a tympanometry study revealed normal functioning in both ears (R. 324, 327, 329), and – although there was external canal cerumen (earwax) partially blocking Hahn's right ear canal – most other clinical findings were normal. (R. 323-27.) The only finding that was not normal was an audiometry test showing that Hahn suffered high frequency hearing loss in both ears with a threshold at 40 decibels. (R. 324, 327, 329.) The rate at which Hahn correctly discriminated speech, however, was 84% in the right ear and 80% in the left year. (Id.) In light of these findings, Dr. Grinberg diagnosed Hahn with tinnitus and bilateral moderate to moderate/severe sensorineural hearing loss. (R. 324, 327.) He opined that Hahn's condition likely stemmed from exposure to occupational noise during his tenure as an audio engineer, and that the condition would likely prevent Hahn from performing his job as an audio engineer in the future. (Id.)

    B.   Right Tibia-Fibula Shaft Fracture

In addition to his hearing impairments, Hahn suffered a right tibia-fibula shaft fracture on

---

[2] Tinnitus refers to a ringing sensation in one or both ears that is not attributable to an external source.

January 2, 2001, while attempting to fix or move a metal shelf.[3] (R. 311-12.) Two days after Hahn was admitted to Nyack Hospital for that injury, Dr. Marc Berezin performed an open reduction and internal fixation of the fracture using an intramedullary nail.[4] (R. 311-14.) Following the operation, Hahn healed well. (R. 311.) He began physical therapy and, after receiving instruction on non-weight-bearing ambulation, was discharged on January 7, 2001. (Id.)

On January 12, 2001, Hahn reported to Dr. Berezin for his first post-operative visit. (R. 347.) At the time, he complained of intermittent soreness in his right leg, particularly when he put his leg down. (Id.) After observing Hahn, Dr. Berezin noted some mild ecchymosis of the right lower extremity.[5] (Id.) Dr. Berezin also found that the right calf was soft, with some mild tenderness, and that the ranges of knee and ankle motion were negative, with no pain noted. (Id.) He did not observe any neurovascular changes, and Hahn's wounds were clean and dry, with no swelling of the leg. (Id.) X-rays showed that the hardware implanted during surgery was in place, and an ultrasound of the lower right extremity was negative for deep vein thrombosis. (Id.; R. 348.) At the conclusion of the consultation, Dr. Berezin advised Hahn to continue non-weight-bearing ambulation and to return in one week for a follow-up visit. (R.

---

[3] Although Hahn notes that he has a history of melanoma and thigh, back, and chest problems (P. Opp. 1), he does not seriously contend that any of these conditions disabled him within the meaning of the Social Security Act. Accordingly, it is unnecessary to recount the history of these conditions.

[4] An intramedullary nail, also known as an intramedullary rod, is a piece of hardware inserted into the bone marrow canal in the center of bones like the tibia or fibula to align and stabilize fractures.

[5] Ecchymosis refers to discoloration of the skin caused by the loss of blood from a blood vessel, as occurs with a bruise or contusion.

347.)

When Hahn returned to Dr. Berezin on January 19, 2001, he complained of some soreness in his right ankle. (R. 346.) After examining him, Dr. Berezin found that the surgical wounds were well healed and that there was no calf swelling or tenderness, although there was some mild swelling of the right ankle. (Id.) In addition, Hahn's range of motion in his right knee was without discomfort. (Id.) While Dr. Berezin noted a slight stiffness with plantar flexion,[6] Hahn showed no neurovascular changes. (Id.) His right ankle joint was symmetric, and an x-ray of that ankle showed callus formation. (Id.) Dr. Berezin instructed Hahn in various range of motion exercises and again advised him to continue non-weight-bearing ambulation. (Id.)

Progress notes completed by Dr. Berezin from February 2, 2001, to December 26, 2001, demonstrate that Hahn's condition continued to improve. (R. 343-46.) In particular, his subjective complaints decreased; his wounds were healed; he achieved full, pain-free range of motion of the right knee and ankle; he had no neurovascular changes and mild or no swelling in his right lower extremity; and his leg was well-aligned. (Id.) X-rays taken in March 2001 showed consolidation of the tibial fracture, and by April 2, 2001, Hahn had transitioned from non-weight-bearing ambulation to weight-bearing ambulation. (R. 345.) While Hahn continued to complain of pain distally over the leg at the fracture site, Dr. Berezin concluded that this pain likely resulted from excessive walking and strenuous physical activities like lifting heavy objects or climbing ladders. (Id.) Accordingly, Dr. Berezin recommended that Hahn reduce such physical activity, but continue full weight-bearing ambulation. (Id.) In May 2001, Dr. Berezin

---

[6] Plantar flexion involves movement equivalent to that of pointing one's toes.

4

added physical therapy to Hahn's regimen, and by June 2001, his notes indicate that Hahn was no longer bothered by the hardware. (R. 344.)

When Hahn returned to Dr. Berezin six months later – in December 2001 – he had no complaints of pain at the fracture site or at the knee. (R. 343.) Although Hahn noted that he experienced some pain when jumping up and down, running at high speeds, or descending stairs, Dr. Berezin observed that Hahn's leg lengths were equal, that he walked with a non-antalgic gait, and that he had "absolutely" no tenderness or swelling in his right lower extremity. (Id.) Dr. Berezin also found that Hahn had full range of motion in his right knee with no joint tenderness, instability, or pain, and x-rays showed that the fracture was well healed and the hardware intact. (Id.)

Several years later, in May 2005, Dr. Berezin conducted another orthopedic consultation with Hahn. (R. 338-42.) During that consultation, Hahn again complained of intermittent pain in his right leg, which bothered him primarily after prolonged standing or when running or trying to walk quickly. (R. 338, 342.) Hahn also complained of pain in his right ankle. (Id.) On examination, Dr. Berezin found that Hahn ambulated with a non-antalgic gait. (Id.) He found right hip motion without pain; a healed surgical incision on the right knee with no swelling, effusion, or tenderness; full flexion extension; and no atrophy or tenderness in the right extremity, with the exception of minimal tenderness over the screws when palpated distally and medially. (Id.) Hahn did have minimal swelling and tenderness in his right ankle anteriorly, but he enjoyed full range of motion and there was no instability or tenderness in the right foot, nor were there any neurovascular changes. (Id.) Finally, x-rays of the leg showed that the hardware and screws were intact, and that the right ankle mortise was symmetric. (R. 338, 340, 342.) Ultimately, Dr. Berezin concluded that Hahn's complaints might be secondary to hardware

and/or a ligamentous injury sustained at the time of the fracture. (R. 339, 342.)

C.     Major Depression

In 2007, Dr. John Fogelman – a psychiatrist – diagnosed Hahn with major depression, including symptoms of sadness, tearfulness, distorted sleep, low energy, and severe general anxiety. (R. 433-34.) While Dr. Fogelman noted that this condition adversely affected Hahn's concentration and general functioning, he also concluded that Hahn had a fair to good ability to make occupational adjustments – including an unlimited/very good ability to understand, remember, and carry out simple, detailed, and complex job instructions and a good ability to follow work rules and function independently – and a fair to good ability to make personal-social adjustments, including a good ability to maintain personal appearances. (Id.)

**II.     Vocational and Other Evidence**

In a self-report of his lifestyle and routine functioning,[7] Hahn noted that he lived with his family and that his daily activities included serving as the primary caretaker of his son, seeing his son off to school, cooking, cleaning, and doing laundry. (R. 255-58.) Hahn also noted that he helped his wife, and did some shopping – in stores and online – when necessary. (R. 256, 259.) In his free time, he enjoyed bike riding, boating, working out at the gym, and socializing with others. (R. 259-60.) When he ventured outdoors – which he did often – he traveled by foot, bicycle, car, and public transportation. (R. 258.) According to him, however, he could not go out alone because if he was on a New York City street it would be safer for him to be accompanied by his wife. (Id.)

---

[7] Hahn's report of his lifestyle and activities is largely consistent with his testimony at his July 2006 administrative hearing. (See R. 457-62.)

6

In describing the manner in which his claimed disabilities affected his ability to perform various activities, Hahn noted that although he did not use a hearing aid,[8] he used amplified telephones that enabled him to converse well by phone. (R. 257, 261.) He and his family dined primarily at home because he had difficulty hearing in noisy restaurants. (R. 257.) While he could follow written instructions, he could not follow spoken instructions unless he read lips. (R. 261.) In addition, because of his hearing loss, Hahn had difficulty paying attention. (Id.) His diminished attention span was further complicated by the ringing in his ears, which was aggravated by stress and sometimes prevented him from finishing tasks that he had begun. (R. 261-62.) Hahn also reported that he had a surgical implant in his right leg and could walk for approximately one mile before having to stop and rest. (R. 261.)

On February 11, 2005, after reviewing Hahn's file, Gerard LaMastra – a vocational expert – joined Dr. Grinberg in opining that Hahn's hearing test results would likely preclude him from performing his job as an audio engineer. (R. 330.) LaMastra noted, however, that Hahn's speech discrimination was "relatively well preserved," and that any impairment was solely non-exertional. (Id.) Accordingly, he concluded that Hahn's hearing loss would not prevent him from meeting the demands of work at all exertional levels and that – from an audiological perspective – Hahn would only be precluded from working in areas with loud ambient noise or in positions requiring the ability to perceive sound at all frequency levels. (Id.) By LaMastra's estimation, these limitations would not prevent Hahn from working in most positions, as he would be able to avoid hazards and communicate effectively. (Id.)

---

[8] Hahn later testified that he did not use a hearing aid because he was advised that doing so could increase the ringing in his ears (tinnitus). (R. 457.)

7

### III. Hahn's Application for Disability Insurance Benefits

On January 5, 2005, Hahn filed an application for disability insurance benefits.[9] (R. 31, 86-88.) The application was denied on March 10, 2005, on the ground that Hahn was capable of performing those jobs to which his hearing problems posed no barrier. (R. 47-50.) Hahn thereafter requested a hearing before an administrative law judge ("ALJ") (R. 52), and on July 28, 2006, he and his counsel appeared before ALJ Katherine Edgell. (R. 437-65.)

At the hearing, Hahn testified that he had stopped working as an audio engineer because of his progressive hearing loss and related tinnitus. (R. 453-56.) He also testified that – with the exception of 1999 – from 1994 to 2001, he assisted his wife with her children's clothing business for 20-30 hours per week. (R. 444-51.) This work included moving boxes, putting up shelving, consulting on a business plan, providing creative input as to clothing designs, and talking to sales representatives by phone. (Id.) In discussing his other allegedly disabling conditions, Hahn noted that the residual pain in his right leg from his broken bone and the intramedullary nail required to repair it precluded him from "do[ing] any lifting or fast moving," and required that he see an orthopedic doctor a few times a year. (R. 456, 458-59.) He also testified that he was undergoing treatment by a psychiatrist for anxiety and depression, although he noted that he had discontinued the prescription medication Effexor because it made him feel worse. (R. 459-60.)

After hearing Hahn's testimony, the ALJ considered the claim *de novo* and – in an August 10, 2006 decision – concluded that Hahn was not disabled. (R. 32-39.) Although the ALJ acknowledged that Hahn's bilateral sensorineural hearing loss, status post fracture of the

---

[9] Although Hahn applied for disability insurance benefits on January 5, 2005, the record suggests that he was given a protective filing date of December 8, 2004. (R. 34.) The date on which Hahn applied for benefits does not bear in any way on the merits of the motion.

right tibia/fibula with open internal fixation surgery, and status post excision of melanoma were severe impairments, she concluded that Hahn was "capable of performing [his] past relevant work as a vice president of a small clothing company," and that he had the residual functional capacity to perform all levels of exertional work, with the exception of those tasks that involved running, fast walking, uninterrupted standing, prolonged exposure to the sun, or very fine hearing.[10] (R. 36-38.) In making this determination, the ALJ relied not only on the medical and vocational evidence of record, but also on Hahn's testimony and her own observations during the taking of that testimony. In particular, she noted that "[Hahn] was able to hear and respond to questions in the hearing room. He acknowledged that he only had difficulty hearing speech when there was a good deal of background noise. He testified that he was able to hear sales people in his prior work activity by using the volume amplifier on a speaker phone." (R. 38.)

On February 9, 2007, after granting Hahn's request for review of the August 2006 decision, the Appeals Council remanded the case to the ALJ for further proceedings. (R. 42-48; see also R. 75-82.) In particular, the Council noted that "it [was] not clear that the job cited by the [ALJ] at step four [of the test used to determine disability met] the requirements to be considered past relevant work" (R. 43), or what the self-employment earnings posted to Hahn's earnings record in 1995 and 1998 represented. (R. 44.)

Following remand, a supplemental hearing was held. (R. 466-81.) Hahn testified again. (See id.) During this hearing, however, he testified that he had never performed any work, and

---

[10] The ALJ did not find Hahn's affective disorder (i.e., major depression) to rise to the level of a severe impairment, in light of Dr. Fogelman's failure to provide any treatment or clinical notes, his conclusion that Hahn had fair to good abilities in all areas of occupational performance and social adjustment, and Hahn's own report that he had never been hospitalized and that he routinely exercised, socialized, and helped his children with homework, among other things. (R. 36-37.)

9

had no job title or responsibility, at his wife's company. (R. 478-79.) Although he admitted that he received profit-sharing as a shareholder of the company, the most he acknowledged doing in the way of working for the company was occasionally assisting his wife in their home with such tasks as answering the telephone. (Id.) In support of this testimony, Hahn provided a work activity report for 1995 and 1998, and a second one for all years after 1996, denying that he worked or performed services for his wife's company after he became a shareholder in 1996. (R. 293-303.) He also provided two letters from his accountant. (R. 125, 436.) The September 6, 2007, accountant's letter stated not only that Hahn had no involvement with the daily operation of his wife's company, but also that he received a shareholder distribution from the company and a "minimum amount of salary . . . for tax and insurance purposes only." (R. 436.) A September 17, 2007, letter reiterated these points. (R. 125.)

In an October 26, 2007, decision, the ALJ – reviewing Hahn's claim *de novo* – again found Hahn not disabled.[11] (R. 14-25.) In contrast to her first decision, the ALJ found that Hahn was unable to perform his past relevant work, which she now determined was solely as an audio engineer and not as a vice president of a small clothing company. (R. 24.) She concluded, however, that Hahn retained the residual functional capacity to perform medium work, except to the extent that such work involved loud ambient noise, the need for fine sound perception at all frequency levels, or constant standing or running. (R. 22.) The ALJ specifically noted that Hahn's right tibia-fibula was successfully repaired, that Hahn had a normal gait, and that no

---

[11] In this decision, the ALJ concluded that neither Hahn's mental disorder nor his history of skin cancer constituted severe impairments. (R. 22.) In particular, she noted that Hahn's affective disorder "resulted in no limitations in [his] ability to conduct his activities of daily living or to sustain social functioning, and a mild restriction for maintaining concentration, persistence, and pace." (Id.) She also emphasized the absence of any evidence of prior "episodes of decompensation." (Id.)

treating physician had concluded that Hahn was totally or partially disabled on account of the injury sustained to his leg. (R. 23-24.) In light of these findings, she perceived no basis for concluding that Hahn was precluded from performing medium work. (R. 24.) As further evidence that Hahn's impairments were not severe enough to render him disabled, the ALJ cited Hahn's ability to hear and understand normal conversations – and thus to detect sounds attributable to occupational hazards – as well as his relative independence, as illustrated by the scope of his daily activities. (Id.) Ultimately, because Hahn could perform medium work, and the limitations on his ability to do so had little or no effect on the occupational base of unskilled medium work, the ALJ determined that a finding of no disability was warranted. (R. 25.) This decision became the final decision of the Commissioner on April 16, 2008, when the Appeals Council denied Hahn's request for further review. (R. 4-7.)

Hahn commenced this action on May 5, 2008, alleging that he has been disabled since December 20, 2001, and that the Commissioner's decision is therefore not supported by substantial evidence. (Compl. ¶ 4.)

## IV.    The Parties' Contentions

The Commissioner argues that substantial evidence supports his conclusion that Hahn is not disabled. (Comm'r Mem. 11-23.) In particular, he contends that the medical and other evidence of record is consistent with the finding that Hahn retains the residual capacity to perform medium work, so long as that work is not performed in areas with loud ambient noise and does not require fine sound perception at all frequency levels or constant running or standing. (Id. 16-22.) Hahn, however, contends that "[t]he Administrative Law Judge improperly evaluated the evidence and determined that [his] past relevant work included that of a manager of a small retail business," and not simply that of an audio engineer. (P. Opp. 1.)

Hahn also argues that the ALJ's decisions are not supported by substantial evidence and that they are inconsistent, as the second decision found Hahn capable of performing medium work, while the first decision did not. (P. Opp. 1, 4-5.)

## DISCUSSION

### I. Standard and Scope of Review

Pursuant to 42 U.S.C. § 405(g), this Court has "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." In reviewing such decisions, the Court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard."[12] Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003); see also Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999) ("First, the Court reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard. Next, the Court examines the record to determine if the Commissioner's conclusions are supported by substantial evidence.") (citations omitted). For purposes of this inquiry, substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402

---

[12] Unlike the Commissioner's factual determinations, his conclusions of law are not subject to the substantial evidence test. See Byam, 336 F.3d at 179. As noted by the Second Circuit, "[w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is [therefore] grounds for reversal." Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) (quotation omitted); see also Turriciano v. Barnhart, No. 03 Civ. 3751, 2004 WL 2326385, at *4 (E.D.N.Y. Aug. 17, 2004) (noting that the substantial evidence test "is irrelevant to the Commissioner's legal conclusions, or to his or her compliance with applicable procedures mandated by statute or regulation, which are reviewed *de novo*").

12

U.S. 389, 401 (1971), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996). Applying these standards, a court "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." Bonet v. Astrue, No. 05 Civ. 2970, 2008 WL 4058705, at *2 (S.D.N.Y. Aug. 22, 2008), citing Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).

## II. Disability under the Act

Title II of the Social Security Act (the "Act") makes federal disability insurance benefits available to those who are "disabled" within the meaning of its terms.[13] See 42 U.S.C. § 423(a), (d). To establish such a disability, a plaintiff must demonstrate (1) that he is unable to engage in any substantial gainful activity by reason of a physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment is supported by evidence obtained by medically acceptable clinical and laboratory diagnostic techniques.[14] See §§ 423(d)(1)(A), (d)(3); see also Parker v. Harris, 626 F.2d 225, 230-31 (2d Cir. 1980); Marrero v.

---

[13] In addition to establishing disability, a claimant also must establish that he or she has attained disability insured status, and that he or she became disabled prior to the expiration of that status. See 42 U.S.C. §§ 423(a)(1)(A), (a)(1)(D), (c); see also Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989); Serrano v. Astrue, No. 05 Civ. 1356, 2008 WL 2622927, at *4 (E.D.N.Y. July 1, 2008).

[14] In particular, the Act states:

> An individual shall be determined to be under a disability . . . if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A).

Apfel, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000).

In determining whether this standard has been satisfied, it is not sufficient that a plaintiff "establish[] the mere presence of a disease or impairment." Marrero, 87 F. Supp. 2d at 346. Rather, "the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity." Id.; see also Berry v. Schweiker, 675 F.2d 464, 466-67 (2d Cir. 1982) (per curiam). For purposes of making this assessment, the Commissioner of Social Security has adopted a five-step analysis. See 20 C.F.R. § 404.1520.

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). In conducting this analysis, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions and/or diagnoses of the examining or treating physicians; (3) any subjective evidence of the claimant's symptoms submitted by the claimant, his family and others; and (4) the claimant's educational background, age, and work experience. See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Marrero, 87 F. Supp. 2d at 346.

Applying these standards, the Court concludes that the Commissioner's decision denying Hahn disability insurance benefits is supported by substantial evidence.

A.  Hearing Loss

Although the record indicates that Hahn has, in fact, suffered some hearing loss, his treating physician concluded that he rarely or never misunderstood words during the course of normal conversation and could thus communicate normally. (R. 323, 325-26.) This conclusion comports with the ALJ's own observations of Hahn during his administrative hearings (R. 24, 38), and with the other medical and vocational evidence of record.[15] Not only did Hahn's audiometry test results show that he correctly discriminated speech 84% of the time in the right ear and 80% of the time in the left ear (R. 324, 327, 329), but the vocational expert who examined him concluded that his hearing impairments would prevent him from working only in those positions with loud ambient noise or those positions requiring the perception of sound at all frequency levels. (R. 330.)

While it is undisputed that there are *some* positions – including, unfortunately, his own past work as an audio engineer – that Hahn cannot hold because of his hearing impairments, the ALJ accounted for these limitations and concluded that they do not preclude Hahn from performing all levels of exertional work. The fact that legally deaf persons – who have more severe hearing impairments than Hahn – are capable of performing many classes of work lends further support to the view that Hahn need not be deemed disabled solely on account of the fact

---

[15] Hahn argues that in considering her own observations of him, the ALJ "blatantly ignor[ed] medical evidence in [his] file." (P. Opp. 3; see also id. 4-5.) This argument is unpersuasive. Not only was the ALJ fully justified in taking Hahn's presentation into account, but her finding that Hahn has little difficulty following normal conversation fully accords with the findings of his otolaryngologist and the other evidence of record.

15

of hearing loss. For these reasons, the ALJ's finding that Hahn's hearing loss does not render him disabled from the kinds of positions he is physically able to perform is amply supported and will not be set aside.

B.    Right Tibia-Fibula Shaft Fracture

In assessing Hahn's ability to perform work other than his past relevant work, the ALJ concluded that he is capable of performing the full range of medium work.[16] (R. 25.) According to 20 C.F.R. § 404.1567, "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." As her decision suggests, the ALJ found no credible evidence that Hahn is unable to meet these requirements.[17] Although Hahn suffered a tibia-fibula shaft fracture in 2001, the repair of which required the use of an intramedullary nail (R. 311-14), the medical evidence of record demonstrates that his leg has fully healed and poses no barrier to his performance of exertional work. (R. 338-48.) At most, due to the residual effects of the injury, Hahn cannot perform jobs that require constant standing or running. (See, e.g., R. 338, 342-43, 345, 458-59.) These limitations necessarily restrict the

---

[16] Hahn argues that this conclusion is invalid because although the ALJ found him capable of performing medium work in her second decision, she failed to do so initially. (P. Opp. 1, 4.) This argument is meritless. After holding a second administrative hearing and considering Hahn's claim *de novo*, the ALJ was entitled to make new and different findings. Indeed, after finding that the ALJ's initial decision was in some respects deficient, the Appeals Council remanded the case for precisely this purpose.

[17] While Hahn testified that he was unable to do any lifting because of the injury to his leg (R. 456, 459, 478), the ALJ noted that no physician had found Hahn even partially disabled on this account. (R. 23-24.) Accordingly, to the extent she declined to credit Hahn's testimony, her decision is supported by the record. This is particularly so given the inconsistencies in Hahn's testimony during the course of his administrative hearings. Hahn initially testified that he performed numerous tasks for his wife's company, but later testified that he performed no such work at all. (Compare R. 441-51, with R. 478-79.) While the ALJ declined to consider this activity past relevant work, the inconsistent testimony nevertheless constitutes a sufficient basis for an adverse credibility finding.

number of jobs that Hahn can perform. They do not, however, render him incapable of performing any and all substantial gainful activity. For these reasons, the Commissioner's conclusion that Hahn is not disabled on account of his leg injury is supported by substantial evidence.

### C. Major Depression

Hahn's claim that he suffers from major depression (P. Opp. 2-3) provides no basis for altering the Commissioner's finding of no disability. The ALJ acknowledged that Hahn was diagnosed with depression. (R. 22.) However, she found no evidence of severe mental disorder prior to the date last insured. (Id.) She also concluded that Hahn's depression was not sufficiently severe to render him disabled. (Id.) In particular, she noted that Hahn's treating physician concluded that he had a fair to good ability to make occupational and social adjustments (id.; see also R. 433-34), and that Hahn himself reported that he routinely exercised, socialized, and contributed to the maintenance of his household. (R. 22; see also R. 255-60.) This evidence demonstrates that, while real, Hahn's depression does not preclude him from performing the medium work for which he is otherwise qualified and thus does not give rise to a disability within the meaning of the Act. As Hahn has cited no evidence contradicting any of these findings, the Commissioner's conclusions are supported by substantial evidence and will not be disturbed.

### CONCLUSION

Plaintiff's hearing loss is sufficiently severe to disable him from continuing with his rewarding, specialized work as an audio engineer. However, disability benefits under the Act are available only to those who are unable to perform *any* substantial gainful activity. For the foregoing reasons, the Commissioner's decision that neither plaintiff's hearing loss nor any of

his other medical conditions render him disabled within the meaning of the Act is supported by substantial evidence. The Commissioner's motion for judgment on the pleadings is therefore granted.

SO ORDERED.

Dated: New York, New York
      May 27, 2009

                                        GERARD E. LYNCH
                                        United States District Judge